Ronald A. LACASSE, Jr.,
et al., Plaintiffs,

v.

WASHINGTON MUTUAL, INC.,
et al., Defendants.

No. C01–1352Z.

United States District Court,
W.D. Washington.

March 1, 2002.

Michael D. McKay, McKay Chadwell, PLLC, Seattle, WA, Richard L. Stone, Mark A. Strauss, Kirby McInerney & Squire, New York City, for plaintiffs.

Stephen M. Rummage, Davis Wright Tremaine LLP, Seattle, WA, James E Pruitt, III, Washington Mutual Legal Dept, Seattle, WA, Michael J. Agoglia, Deborah A. Mosley, Morrison & Foerster, San Francisco, CA, for defendants.

## ORDER

ZILLY, District Judge.

This matter is before the Court on two motions: the defendants' motion to strike the plaintiffs' class allegations, docket no. 13, and the plaintiffs' motion for class certification, docket no. 22. The plaintiffs are a putative class of mortgage borrowers and the defendants' are financial institutions engaged in the business of making

consumer loans to home buyers. The plaintiffs claim that the defendants' payment of yield spread premiums to mortgage brokers violates the anti-kickback provisions of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 et seq., the Washington Consumer Protection Act, RCW 19.86 et seq., and the consumer protection acts of other states.[1] The plaintiffs' seek class certification under Rule 23(b)(3) of the Federal Rules. The primary issue raised by these motions is whether common questions of law or fact predominate over individuals questions as required by Rule 23(b)(3).

## BACKGROUND

The plaintiffs' theory of the case is that Washington Mutual Bank and its affiliates[2] collectively and individually pay yield spread premiums[3] to mortgage brokers solely for the referral of loan business, in violation of Section 8 of RESPA.[4] Plaintiff Ronald A. LaCasse, Jr. retained Major

Mortgage for the purposes of acquiring a mortgage loan. First Amended Complaint, docket no. 7, at ¶ 33. In consideration of finding and arranging a loan, the plaintiff agreed to pay Major Mortgage a "processing fee" of $500. Id. The plaintiff's application was forwarded to and approved by Washington Mutual. Id. at ¶ 34. The amount of the loan was $90,750.00. The HUD–1 Settlement Statement shows that, in addition to the $500 processing fee, Washington Mutual made a payment to Major Mortgage in the amount of $1,134.38, denominated as a "yield spread premium." Id. at ¶ 35. According to the plaintiffs, Washington Mutual maintained no records of the "kind or amount of work" done by Major Mortgage and did not pay the yield spread premium according to "such criteria." Id. at ¶ 35. Because Washington Mutual disbursed the loan proceeds directly to the borrower, Washington Mutual was the owner of the loan at all times. Id. at ¶ 36.[5]

---

1. The plaintiffs' claims under the Washington Consumer Protection Act and similar acts of other states depend upon a finding of liability under RESPA.

2. Washington Mutual, Inc. and numerous subsidiaries and affiliates of Washington Mutual, Inc. have been named as defendants to this action. For the sake of convenience, these parties will be referred to as "defendants" or "Washington Mutual."

3. Yield spread premiums are payments made by lenders to mortgage brokers who originate loans that are above the minimum rate of interest charged by the lender at a given point in time. All the loans at issue in this case were made through a mortgage broker, who acts as an intermediary between the borrower and the lender. A broker may receive compensation in a number of ways. First, the borrower may pay an up-front origination fee, either fixed or based upon the amount of the loan, to the broker for the services provided. Alternatively, the borrower may pay a slightly higher interest rate in exchange for a reduction or elimination of the up-front fees. This is referred to as an above par loan. Because

the loan carries a higher interest rate, it is more valuable to investors on the secondary market. Thus, the lender will pay the broker a percentage of the loan amount reflecting this increase in value. See Real Estate Settlement Procedures Act Statement of Policy 2001–1: Clarification of Statement of Policy 1999–1 Regarding Lender Payments to Mortgage Brokers, and Guidance Concerning Unearned Fees Under Section 8(b), 66 Fed.Reg. 53052, 53054 (Dep't of Hous. & Urban Dev., October 18, 2001).

4. For purposes of this motion, the factual assertions in the plaintiffs' complaint are taken as true. See Blackie v. Barrack, 524 F.2d 891, 901 n. 17 (9th Cir.1975), cert. denied, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976).

5. The plaintiffs allege four other transactions that are substantially similar to the LaCasse transaction, except for the amount of the loan and fees. Plaintiff Judy Lynn Pouley borrowed $300,000.00 from Washington Mutual. In this transaction, Ms. Pouley paid the mortgage broker a $345 fee and Washington Mutual paid a yield spread premium to the bro-

## DISCUSSION

### I. THE FRAMEWORK FOR LIABILITY UNDER RESPA

Congress enacted the Real Estate Settlement Procedures Act (RESPA) in 1974 to shield home buyers "from unnecessarily high settlement charges caused by certain abusive practices." 12 U.S.C. § 2601(a). Section 8(a) of RESPA proscribes giving or accepting "any fee, kickback, or thing of value pursuant to any agreement or understanding ... that business incident to or a part of a real estate settlement service ... shall be referred to any person." 12 U.S.C. § 2607(a). Section 8(b) similarly prohibits the payment of a percentage or any other division of any charge except for services actually rendered. 12 U.S.C. § 2607(b). Section 8(c) provides a safe harbor, however, stating in relevant part that "[n]othing in this section shall be construed as prohibiting ... (2) the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for ser-

vices actually performed ...." 12 U.S.C. § 2607(c)(2).

■ Neither RESPA nor Regulation X, the implementing regulations promulgated by HUD,[6] expressly address the legality of yield spread premiums. Two interpretations of the rule of liability under Section 8 have evolved. The first is drawn from a Statement of Policy issued by HUD in 1999. 64 Fed.Reg. 10080.[7] The Policy Statement indicates unequivocally that HUD does not consider yield spread premiums as being per se legal or illegal. *Id.* at 10084. Instead, it articulates a two-part test to determine whether a payment violates § 8 of RESPA. The first prong of the test is "whether goods or facilities were actually furnished or services were actually performed for the compensation paid." *Id.* This first prong is not determinative, however. If some goods or services have been provided in exchange for the payment, then the second prong of the test requires an analysis of "whether the payments are reasonably related to the value of the goods or facilities that were

---

ker in the amount of $3,000. *Id.* at ¶ 39. Plaintiffs Irma Harris and Ortez Guzman borrowed $42,968.00 from Washington Mutual. In their transaction, they paid $190.00 processing fee to their broker, who Washington Mutual paid $1,290.00 as a "loan origination" fee. *Id.* at ¶ 44. The Gibsons borrowed $103,550.00, paying a $295 processing fee to the broker, who also received $2,071.00 from Washington Mutual. *Id.* at ¶ 49. Finally, Mr. and Mrs. Winship borrowed $495,490.00 from Washington Mutual. In this instance, the Winships did not directly pay any fees to the mortgage broker. *See id.* at ¶ 54. Instead, it appears that the brokers compensation was paid entirely by Washington Mutual, in the form of a $6,812.99 yield spread premium. *See id.*

6. Congress authorized HUD "to prescribe such rules and regulations, to make such interpretations, and to grant such reasonable exemptions for classes of transactions, as may be necessary to achieve the purposes of [RESPA]." 12 U.S.C. § 2617(a). In accord with

this grant, HUD promulgated Regulation X, which is codified at 24 C.F.R. § 3500 *et seq.* Section 3500.14 reiterates the statutory prohibitions and exemptions contained in § 8(a)—(c). Additionally, § 3500.14(g)(2) adds that "[HUD] may investigate high prices to see if they are the result of a referral fee .... If the payment of a thing of value bears no reasonable relationship to the market value of the goods or services provided, then the excess is not for services or goods actually performed or provided .... These facts may be used as evidence of a violation of Section 8 ...." 24 C.F.R. § 3500.14(g)(2).

7. *Real Estate Settlement Procedures Act (RESPA) Statement of Policy 1999–1 Regarding Lender Payments to Mortgage Brokers,* 64 Fed. Reg. 10080 (Dep't of Hous. & Urban Dev., March 1, 1999). Under 24 C.F.R. § 3500.4(a)(1)(ii), HUD statements of policy published in the Federal Register have the legal effect of a regulation. *Culpepper v. Irwin Mortgage Corp.,* 253 F.3d 1324, 1327 (11th Cir.2001).

actually furnished or services that were actually performed." *Id.* HUD takes the position that "[t]he determinative test under RESPA is the relationship of the services, goods or facilities furnished to the total compensation received by the broker." *Id.* at 10085. This approach has been followed by the majority of courts that have considered this issue, both before and after the issuance of the Policy statement. *See, e.g., Bjustrom v. Trust One Mortg.,* 178 F.Supp.2d 1183 (W.D.Wash.2001); *In Re Old Kent Mortg. Co. Yield Spread Premium Litigation,* 191 F.R.D. 155 (D.Minn.2000); *Levine v. North Am. Mortg.,* 188 F.R.D. 320 (D.Minn.1999); *Taylor v. Flagstar Bank, FSB,* 181 F.R.D. 509, 512 (M.D.Ala.1998).

The notable exception is the Eleventh Circuit's decisions in the *Culpepper* line of cases, which represent the minority interpretation. In *Culpepper v. Inland Mortg. Corp.,* 132 F.3d 692, 696 (11th Cir.1998) ("*Culpepper I* "), the court held that the legality of yield spread premium payments could be determined under Section 8 of RESPA without reference to any analysis of whether the payments bore a reasonable relationship to the services provided. The court based its conclusion in large part on the fact that there was no evidence that the yield spread premium was paid in exchange for any goods or services but was instead paid solely as a referral fee. *Id.* at 696—97.

In *Culpepper v. Irwin Mortg. Corp.* ("*Culpepper III* "), the court addressed the defendants' appeal of the district court's approval of class certification. The lender argued that class certification was inappropriate because HUD's 1999 Policy Statement mandated a two-part test that required an analysis of the reasonableness of each transaction. 253 F.3d 1324, 1328

(11th Cir.2001). As the lender interpreted the test, the first step required only a showing that some goods or services were provided; if that step was met, then the court was required to assess the reasonableness of the payments. *Id.*

The court rejected this argument, instead holding "that the first step in the test for liability under § 8 is not only whether the broker performed some of the services described in the HUD statement, but also whether the yield spread premium is a payment for those services rather than a referral." *Id.* at 1331. The yield spread premium must somehow be tied to the provision of specific goods or services. *Id.* The *Culpepper* court found it unnecessary to analyze the reasonableness of the yield spread premiums under the second prong of the HUD test because the yield spread premiums at issue were payment solely for referrals and not for goods or services. *Id.* Accordingly, the court concluded that the district court did not abuse its discretion in holding that common questions predominated over individual questions. *Id.* at 1332.

In response to *Culpepper III,* HUD issued another policy statement in 2001 "to eliminate any ambiguity concerning the Department's position with respect to . . . yield spread premiums." 66 Fed.Reg. 53052, 53052.[8] HUD reiterated its prior position "that yield spread premiums are not per se legal or illegal." *Id.* The agency further noted that "a yield spread premium can be a useful means to pay some or all of a borrower's settlement costs." *Id.* at 53054.

The 2001 Statement of Policy expressly disagrees with the Eleventh Circuit's holding in *Culpepper III:*

---

**8.** *Statement of Policy 2001–1; Clarification of Statement of Policy 1999–1 Regarding Lender Payments to Mortgage Brokers, and Guidance* *Concerning Unearned Fees Under Section 8(b),* 66 Fed.Reg. 53052 (Dep't of Hous. & Urban Dev., Oct. 18, 2001).

The crux of the [*Culpepper III*] decision is that Section 8 liability for the payment of unlawful referral fees could be established under the first part of the HUD test alone, based on the facts that the lender's payments to mortgage brokers were calculated solely on the difference between the par interest rate and the higher rate at which the mortgage brokers delivered loans, and that the lender had no knowledge of what services, if any, the brokers had performed. HUD was not a party to the case and disagrees with the judicial interpretation regarding Section 8 of RESPA and the 1999 Statement of Policy.

66 Fed.Reg. 53052, 53054—55.

In clarifying its test for liability, HUD states that under the first prong, "the total compensation to a mortgage broker, of which a yield spread premium may be a component or the entire amount, must be for goods or facilities provided or services performed." *Id.* In making this determination, "it is necessary to look at each transaction individually." *Id.* The second part of the test requires that the total compensation paid reasonably relate to the goods, facilities or services provided. *Id.* at 53055. Because all fees and payments must be scrutinized together, HUD "believes that the second part of the test is applied by determining whether a mortgage broker's total compensation is reasonable." *Id.* For determining the reasonableness of the payments, HUD indicates that they should be reasonable in the context of the amount normally charged within the relevant market in which the loan is made. *Id.*[9]

## II. STANDARD FOR CLASS CERTIFICATION

In order to be certified as a class action, a cause of action must satisfy all four prerequisites of Fed.R.Civ.P. 23(a) and at least one of the requirements set forth in Fed.R.Civ.P. 23(b). *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). Class certification may be achieved "only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a). Once these prerequisites are established, it must then be demonstrated that a class action is maintainable under Rule 23(b). Fed. R.Civ.P. 23(b); *Valentino*, 97 F.3d at 1234.

The plaintiff bears the burden of establishing the propriety of class certification under Rule 23(a) and (b). *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). In making a determination of class certification, the court is obliged to take the allegations contained in the plaintiffs' complaint as true. *Blackie v. Barrack*, 524 F.2d 891, 901 n. 17 (9th Cir.1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976). Although the court should not make a preliminary determination of the merits of the plaintiffs' claims, *Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), the court is required to engage in a

---

**9.** HUD also takes the position that there is no presumption that a yield spread premium is illegal simply because the yield spread premium is triggered by the referral of an above par loan based on a lender's rate sheet. 66 Fed. Reg. at 53055. Because "yield spread premiums are by definition derived from the interest rate" the loan carries, HUD states that the

fact that a yield spread premium is generated with reference to the interest rate of the loan is not determinative of whether the yield spread premium is an illegal referral payment. *Id.* Instead, HUD takes the position that the legality or illegality must be determined with reference to how the two-part test applies to the transaction. *Id.*

"rigorous analysis" that "probes behind the pleadings" in order to determine whether certification is appropriate. *Castano v. American Tobacco Co.*, 84 F.3d 734, 744—45 (5th Cir.1996).

## III. ANALYSIS

### A. Rule 23(a)

Under Fed.R.Civ.P. 23(a), the plaintiffs are required to satisfy the elements of numerosity, commonality, typicality, and adequacy of representation. The defendants do not contest any of these elements, with the exception of numerosity. Because the Court ultimately concludes that class certification is inappropriate under Rule 23(b)(3), only a limited discussion of Rule 23(a) is required. Although the defendants argue that the plaintiffs' allegations of numerosity are conclusory, there can be no serious dispute that the proposed class, if certified, would consist of literally thousands of borrowers, given the volume of lending transactions the defendants enter into. Thus, the element of numerosity is met. *See, e.g., Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 930 (11th Cir.1983). Since the fundamental issue of the legality of yield spread premiums is uniform among class members, the relatively low threshold commonality requirement is also met. *See In re School Asbestos Litig.*, 789 F.2d 996, 1010 (3rd Cir.1986). Likewise, the typicality requirement is met here because the common allegation made by each plaintiff is that the yield spread premiums paid by the defendants are in each instance unlawful under Section 8(a) of RESPA. *See O'Sullivan v. Countrywide Home Loans, Inc.*, 202 F.R.D. 504, 510 (S.D.Tex.2001). Finally, there is no indication of any conflict that would prevent the class representatives from adequately representing the class plaintiffs. *See* Fed.R.Civ.P. 23(a)(4).

### B. Rule 23(b)(3)

In this instance, the plaintiffs seek class certification under Rule 23(b)(3), which requires the Court to "find[ ] that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). Thus, in order to be certified as a class under Rule 23(b)(3), the plaintiffs must demonstrate an ability to utilize generalized, class-wide evidence to prove, in each instance, that the defendants' payment of yield spread premiums violates Section 8 of RESPA. *See Levine v. North American Mortgage*, 188 F.R.D. 320, 331 (D.Minn.1999).

The plaintiffs' claims fail to meet this requirement. Under Section 8 of RESPA, as interpreted by HUD and an overwhelming majority of the courts, a determination of the plaintiffs' claims will require an individual analysis of the yield spread premium paid in each transaction, with a particular emphasis on the relationship between the payment and the goods or services provided. *See* 2001 HUD Statement, 66 Fed.Reg. 53052, 53055; *Bjustrom v. Trust One Mortgage*, 178 F.Supp.2d 1183, 1196 (W.D.Wash.2001); *Drootman v. First Nationwide Bank*, No. 97–252 PHX TSZ, slip op., at 8 (Feb. 12, 1999); *In re Old Kent Mortg. Co. Yield Spread Premium Litig.*, 191 F.R.D. 155 (D.Minn.2000); *Burgan v. Countrywide Funding Corp.*, No. C98–1819Z, slip op. (W.D.Wash. May 25, 1999); *Levine v. North Am. Mortg.*, 188 F.R.D. 320 (D.Minn.1999); *Taylor v. Flagstar Bank, FSB*, 181 F.R.D. 509, 512 (M.D.Ala.1998). The plaintiffs, however, suggest that the Court should abandon the majority rule in favor of the rule set forth in *Culpepper III*. The Court declines this invitation, not

only because HUD's interpretation is entitled to substantial deference, but also because *Culpepper III* is ultimately unpersuasive on the facts of the instant case.

■ The plaintiffs urge the Court not to accord any deference to HUD's interpretation for two reasons. The plaintiffs first argue that HUD's policy statements do not qualify for deference under *Chevron v. Nat. Res. Def. Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), because they are not the product of formal notice-and-comment procedures, but are instead "mere policy statements." The plaintiffs cite *Christensen v. Harris County*, 529 U.S. 576, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000), for this proposition. Under *Chevron*, when Congress has charged an agency with the administration of a statute, that agency's interpretation of the statute should be accorded controlling deference unless its interpretation is arbitrary, capricious, or contrary to the statute. 467 U.S. at 843—44, 104 S.Ct. 2778. Although the majority of the cases finding *Chevron* deference deal with legislative rules promulgated through notice-and-comment proceedings, *Chevron* deference nevertheless may apply to a less formal agency interpretation "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 121 S.Ct. 2164, 2171, 150 L.Ed.2d 292 (2001). Thus, even if an interpretation is not the product of formal notice-and-comment procedures, it may nevertheless be entitled to deference if there is "some other indication of comparable congressional intent." *Id.* 121 S.Ct. at 2171. The HUD policy statements evince this "other indication of comparable congressional intent" because they were issued pursuant to a grant by Congress to issue rules and interpretations and to grant exemptions with respect to RESPA. *See* 12 U.S.C. § 2617(a). Under RESPA's implementing regulations, HUD's official policy statements, published in the Federal Register, have the force of law equivalent to a legislative rule. 24 C.F.R. § 3500.4(a); *Culpepper III*, 253 F.3d at 1327, 1329. Finally, as an interpretation of its own regulations, HUD's interpretation should be accorded deference unless that interpretation is "plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (citations and internal quotes omitted).[10] Thus, HUD's interpretation of RESPA qualifies for *Chevron* deference unless it is unreasonable.

The plaintiffs also contend that HUD's interpretation should not be accorded deference because it is irrational and inconsistent with the plain language of Section 8. The plaintiffs believe that HUD's reasonableness test finds no support in the plain language of the statute. This argument

10. Even if the Court did not find that HUD's interpretation should be accorded *Chevron* deference, it would nevertheless find that its interpretation is entitled to some deference under *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944). Under *Skidmore*, an agency's interpretation of a statute, even if "not controlling upon the courts by reason of their authority," may "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Id.* at 140, 65 S.Ct. 161. The relative weight of an administrative interpretation under *Skidmore* is determined by "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Mead*, 121 S.Ct. at 2172 (quoting *Skidmore*, 323 U.S. at 140, 65 S.Ct. 161) (internal quotes omitted). The appropriate level of deference depends upon "the degree of the agency's care, its consistency, formality, ... relative expertness, and ... the persuasiveness of the agency's position." *Mead*, 121 S.Ct. at 2171.

misses the mark as well. Section 8 of RESPA is accurately described as "ad hoc" because it does not state a precise rule of liability. *See Taylor v. Flagstar Bank, FSB*, 181 F.R.D. 509, 514 (M.D.Ala. 1998). Section 8(c) excludes from liability payments exchanged "for goods or facilities actually furnished or services actually performed." 12 U.S.C. § 2607(c). The statute does not provide any means for actually determining whether a payment is exchanged "for" goods or services. However, HUD's regulation provides that "[i]f the payment of a thing of value bears no reasonable relationship to the market value of the goods or services provided, then the excess is not for services or goods actually performed or provided." 24 C.F.R. § 3500.14(g)(2). This tracks closely with the legislative history of Section 8, which states that the purpose of subsection (c) is to make clear that Section 8 "is not intended to prohibit [payments] for goods furnished or services actually rendered, so long as the payment bears a reasonable relationship to the value of the goods or services received by the person or company making the payment." S.Rep. No. 93–866, reprinted in U.S.C.C.A.N. 6546, 6551 (1974). Thus, it cannot be said that HUD's interpretation of Section 8 is an unreasonable one and the Court declines the plaintiffs' invitation to abandon it.[11]

Even if the Court were to decide against adopting HUD's interpretation of Section 8, the same result would obtain. The plaintiffs would still be required to demonstrate the ability to prove liability under Section 8 using generalized, class-wide evidence. The plaintiffs have failed to do so and *Culpepper III* provides little help in this regard. The plaintiffs rely on *Culpepper I* for the proposition that the determinative test for yield spread premiums is whether the yield spread premium can be tied to specific goods or services actually provided.[12] Under the plaintiffs' theory of the case, the defendants' yield spread premiums violate Section 8 of RESPA because they were not paid in exchange for any goods or services actually provided. *See* First Amended Complaint, docket no. 7, at ¶ 2. As proof that the defendants' yield spread premiums are not exchanged for goods or services actually provided, the plaintiffs allege that the defendants' payment of a yield spread premium depend solely upon the interest rate of the loan and are not based upon the services performed by the broker. *See id.* at ¶ 27, 29 & 30. In an effort to demonstrate that this practice has class-wide impact, the plaintiffs allege that the defendants' yield spread premium payments are administered by a nationwide program. *See id.* at ¶ 18 & 19. However, the plaintiffs' core allegation seems to be that the defendants yield spread premiums are per se illegal: "[b]ecause the mortgage broker receives a YSP only when it originates an above par loan, the only 'service' for which the YSP is compensation is the broker's 'service' of

---

11. The plaintiffs also assert that HUD's policy statement intrudes upon the judiciary's exclusive domain by seeking to improperly define the type of action that may be certified under Rule 23. Although HUD's interpretation may, as a practical matter, substantially limit the availability of class actions in yield spread premium cases, nothing in HUD's policy statement can be seen as an attempt to alter the contours of Rule 23.

12. In concluding that the yield spread premium in that case was not compensation for the broker's services, the *Culpepper* court found that "the sole determinant of whether a yield spread premium would be paid was the interest rate on the loan." *Culpepper I*, 132 F.3d at 697. The Court also noted that the broker "expends the same amount of effort and provides the same quality and quantity of services" regardless of the interest rate of the loan. *Id.* at 697. The Court concluded that "because [the broker] receives a yield spread premium only when it originates an above par loan, the premium cannot be characterized as payment for originating the loan." *Id.*

referring an above par loan to the lender ...," which would be a conceded violation of Section 8. *Id.* at ¶ 2.

Even if true, these factual allegations do not give rise to a presumption that all of the defendants yield spread premiums are paid as referrals rather than compensation for goods or services provided. *See* HUD Statement, 66 Fed.Reg. at 53054. The plaintiffs' argument amounts to a tautology because it uses incidents common to all yield spread premiums as evidence that the yield spread premiums constitute unlawful referrals. Yield spread premiums are by definition paid when a broker originates an above par loan. *Id.* Further, the mere fact that a broker performs the same level of services when paid a yield spread premium is not dispositive of liability under Section 8. Although some or all of the plaintiffs' yield spread premiums may be referral payments, it is equally possible that most, if not all, of the yield spread premiums may be compensation for services, in addition to or in lieu of up-front fees or points. *See Taylor,* 181 F.R.D. at 523; *Drootman,* No. 97–252 PHX TSZ at 10. Thus, the plaintiffs' argument proves too much because taken to its logical conclusion, all yield spread premiums would be per se illegal.

Given the possibility that some or all of the defendants' yield spread premiums may have constituted an exchange for goods or services, it would be impossible to determine liability from generalized proof. The transaction involving two of the plaintiffs, Mr. and Mrs. Winship, illustrates this point precisely. In the Winship transaction, no origination fee was paid. First Amended Complaint, docket no. 7, at ¶ 54.

Instead, it appears that the broker's entire compensation was in the form of a yield spread premium. *See id.* Since mortgage brokers presumably do not provide goods and services for free, the reasonable conclusion is that the yield spread premium paid in the Winship transaction was at least in part exchanged for goods and services provided by the broker, a payment permissible under 12 U.S.C. § 2706(c).

In light of the above discussion, the Court concludes that the plaintiffs have failed to provide any basis for determining liability on a class-wide basis. Regardless of the merits of any individual claim, there would simply be no way to determine liability in a generalized manner. Because the plaintiffs' claims are not subject to generalized proof, the Court holds that class certification is inappropriate because common questions of fact or law will not predominate over questions requiring resolution on an individual basis. Fed. R.Civ.P. 23(b)(3).

The plaintiffs have also failed to meet the requirement that a class action would be the superior method of adjudicating the case. Given that the Court would have to analyze each individual yield spread premium transaction, adjudication on a class basis would "devolve into [a] ... thicket of individualized claims," defying the policy of judicial economy underlying Rule 23. *Brancheau v. Residential Mortg. Group,* 177 F.R.D. 655, 663—64 (D.Minn.1997).[13]

### CONCLUSION

In sum, the plaintiffs' have failed to meet the requirements for class certification under Fed.R.Civ.P. 23(b)(3). Accordingly, the Court DENIES the plaintiffs'

---

**13.** The plaintiffs' motion for class certification also fails with respect to their claims under Washington's Consumer Protection Act and similar acts of other states. These consumer protection act claims are derivative of and entirely dependent upon liability under Section 8 of RESPA. Because the plaintiffs' RESPA claims fail to meet the standard for class certification under Fed.R.Civ.P. 23(b)(3), the plaintiffs' derivative state consumer protection act claims also fail to qualify for class certification.

motion for class certification, docket no. 22. In light of this result, the Court STRIKES as moot the defendants' motion to strike the class allegations, docket no. 13.

IT IS SO ORDERED.